**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07 C 46 |
| | ) | |
| | ) | |
| **JOHN L. SMITH,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Following a jury trial in *United States v. Smith*, No. 03 CR 133 in November of 2004, defendant John L. Smith ("Smith") was found guilty of several charges involving conspiracy and possession of cocaine with intent to distribute, money laundering, tax evasion, and filing false tax returns. He received a sentence of 292 months, with shorter terms on lesser counts to run concurrently. Following a voluntary dismissal of his appeal to the Seventh Circuit, Smith filed a motion to vacate, set aside or correct his sentence under 28 U.S.C. § 2255 (2007), contending that he received ineffective assistance of counsel during his trial because his trial counsel (1) failed to object to the government's case; (2) coerced Smith into not testifying on his own behalf; (3) failed to investigate and call certain defense witnesses; and (4) failed to object to the government's *Santiago* proffer and Rule 404(b) evidence. I deny Smith's motion.

Smith was indicted in February of 2003 on multiple counts of conspiracy to distribute cocaine (in a conspiracy running from 1995 to 1998), money laundering stemming from his purchase of a luxury automobile, and tax evasion and filing false tax returns for the years 1997, 1998 and 1999. The indictment alleged that while Smith was a sworn police officer with the Chicago Police Department ("CPD"), he stole cocaine from the Evidence and Recovered Property Section ("ERPS") and entered into a conspiracy with a local drug dealer to distribute the cocaine. The indictment further alleged that Smith falsely claimed winnings from gambling in efforts to legitimize his income from the narcotic sales.

The testimony at trial included the following:[1]  During the time that Smith was a police officer assigned to ERPS, it was discovered that 20 kilograms of cocaine had been stolen from the department. Subsequent investigations and audits by the CPD and FBI revealed that other large quantities of cocaine had also gone missing during the time that Smith worked at ERPS.

The government presented evidence of lax security at ERPS and ways that Smith, who worked alone on weekends, would have had access to large amounts of cocaine, and would have been able to get the drugs out of the facility. Sergeant Dana Starks (currently the

---

[1]Additional witnesses testified and additional evidence was presented at trial that is not discussed in this opinion because it is not relevant to Smith's § 2255 motion.

acting superintendent of the CPD)) testified that on one occasion
he saw Smith with a large black duffle bag at the door of the vault
which held the drug exhibits. When Sparks questioned Smith, Smith
stated he was using the duffle bag to carry his lunch.

Further evidence was presented that between 1995 and 1998
Smith supplied cocaine to William James a/k/a Fats ("James").[2]
During this time period, a number of people helped James sell
cocaine and "cook" it to produce and sell cocaine base. Several
co-conspirators testified and described how Smith supplied James
with cocaine. James would announce that he was nearly out or out
of cocaine, and would ask everyone to leave the home. A man named
"Smitty," identified by several of the co-conspirators at trial as
Smith, would arrive, frequently carrying a black bag that appeared
full. Smith and James would meet alone, and after Smith left there
would be cocaine in the house that the co-conspirators would cook
into crack cocaine and bag for resale. Other testimony revealed
Smith's participation in the drug conspiracy. A number of
co-conspirators testified that James or another co-conspirator told
them that Smitty was a police officer who worked in the evidence
room, and one co-conspirator testified that James himself told her
that he was able to take drugs from ERPS. One co-conspirator
testified that she saw zip-lock bags containing powder cocaine
inside of Smith's duffel bag, and saw James hand Smith bundles of

[2]James passed away in February of 2001.

3

cash.  Four co-conspirators made a positive in-court identification of Smith as "Smitty" and also identified a picture of a blue convertible Ford Mustang as the car that Smith would drive to James's house.  The government presented evidence that the same car was registered to Smith and his wife, and that during a search of Smith's home, the police vacuumed the car; testing of the vacuumed material revealed cocaine residue. Testing also revealed cocaine residue in a safe located in Smith's closet.  In addition, evidence showed that checks totaling $12,000 that one co-conspirator gave to James with the payee line blank ended up made out to Smith, endorsed by Smith, and deposited into his bank account.  One co-conspirator also testified that she heard James and Smith discussing "cooking" cocaine.

The government also presented testimony from Jason Rauner ("Rauner") a government witness who at the time of his testimony was in custody for narcotics convictions, who testified that he sold cocaine with Smith's nephew Terry Smith ("Terry") from 1992 until 1996.  His testimony was admitted under Federal Rule of Evidence 404(b).  He testified that he met Terry in 1989 or 1990 and purchased cocaine from him until about 1996.  He testified that although he had been purchasing smaller amounts of powder cocaine from Terry at first, around late 1994 or 1995 he began purchasing half kilogram and kilogram quantities of cocaine from Terry, and made numerous purchases in this amount.  He said that during this

time he eventually learned that Terry's supplier was Smith; Rauner became suspicious of cocaine he was receiving from Terry that was in a powder form, which is unusual because cocaine purchased off the street is usually solid. Rauner was suspicious that the cocaine he was purchasing might have been "hit" or "played with," but Terry reassured him that the cocaine was coming from his uncle Smith, a police officer who worked in the evidence room, and that Smith was stealing the cocaine out of the evidence room. Terry told him that the cocaine came back from the testing lab in powder form. Rauner also testified that on one occasion he went to Terry's house to pay Terry, and Smith came over and he saw Terry give Smith the money that he had just given Terry. He also testified that in 1995, when Terry was in jail on a drug charge, he visited Terry and Terry told him that Smith would call him directly about money that Rauner owed Terry. Smith then called Rauner and told him that he needed to collect the money Rauner owed Terry. Smith directed Rauner to deliver the money to a friend of Smith's. Later, Smith called Rauner and told him Rauner had not paid enough, but Rauner never paid him any additional money.

The government also presented "lifestyle" evidence about Smith's spending habits from 1996 to the time of trial. Among other things, Smith purchased a $177,000 Rolls Royce and leased two other high-end cars for himself and his wife. He bought a new home and an apartment complex. A search of his home found furs,

high-end electronics, and expensive jewelry. Three women testified that they had relationships with Smith, during which time he bought them gifts, including cars, jewelry, and appliances and took them on trips to Las Vegas where he would give them cash for gambling. One woman testified that on one occasion when she was at Smith's residence she saw a chunk of cocaine in his possession.

Other evidence demonstrated that Smith began gambling heavily around 1996 and claimed large net winnings on his tax returns. Records from casinos were introduced, and included all of Smith's activities while he used casino "players' cards" as he gambled ("tracked play"), as well as W2-G forms, which were generated every time Smith won more than $1,200 playing slot machines. Those records revealed that Smith lost significant amounts of money during his tracked play. The government produced evidence that Smith could not have won the amount of money he claimed on his tax returns during play in which he did not use players' cards ("untracked play"). W2-G forms which had been generated during Smith's untracked play were compared to W2-G forms that had been generated during his tracked play. The comparison showed the percentages of time that Smith engaged in tracked play and the amount of time he engaged in untracked play. An expert in gaming testified that Smith would have had to win hundreds of times in amounts under $1,200 during his untracked play, and that this was statistically impossible. Gaming experts refuted the possibility

that Smith could have had a "system" for consistently winning by playing slot machines. They testified that statistically, a gambler would inevitably lose at slots and there was no strategy or theory that someone could utilize to manipulate slot machines. A "net worth" analyst further testified that a review of Smith's assets, liabilities and expenditures during the relevant years shows that Smith's taxable income far exceeded what Smith reported on his tax returns for the years in question.

Smith presented testimony from his brother, who testified that when his and Smith's sister was dying she asked Smith to look after her son Terrence Smith, who was receiving $87,000 in proceeds from an insurance policy and who she was concerned was irresponsible. Smith also presented testimony from his friend, a former police officer and former partner of Smith's for nine years, who testified that he went gambling with Smith approximately 12 to 14 times after 2000. He testified that he saw Smith playing high-value slot machines, and that when Smith went into a casino he would walk through to "see if anyone was being paid off by the employers there, and if no one was being paid off, then he wouldn't gamble." After this testimony the government presented additional testimony from someone who reviewed Smith's bank records, who stated that a check of roughly $87,000 made out to Terence Smith by Continental Assurance Company was deposited into Smith's bank account, and that about three weeks later Smith withdrew $65,000 from the account via

a cashier's check and used it to purchase an apartment building. Smith also presented a stipulation that one co-conspirator testified to the grand jury in this case that no one in James's house other than James sold cocaine.

Following this testimony, both sides rested. The government's closing argument summarized much of the evidence above, arguing that it established beyond a reasonable doubt that Smith stole drugs from ERPS, participated in a conspiracy with James and others to possess and sell large amounts of drugs, laundered certain amounts of money from the drug transactions to purchase his Rolls Royce, lied about his gambling winnings to hide his winnings, and filed false tax returns and evaded paying his taxes.

Defendant's counsel's closing argument began by discussing evidence of how ERPS was in disarray, and suggested that any ERPS employee could have stolen from ERPS, that the missing drugs could have been accidentally destroyed or otherwise lost, and that it was very probable that ERPS employees cleaning up spilled drugs could have had trace amounts of those drugs end up on their hands and clothes and then elsewhere in their homes and personal property. She argued that all of the co-conspirators who testified were untrustworthy people who lied to investigators and the grand jury, and who were taking large amounts of drugs during the time period about which they testified. She finally argued that the jury could discount the testimony from the gambling experts about the

impossibility of Smith's gambling strategy, contending it was possible Smith did play at certain machines which could lead to winnings in the amounts he claimed.

The jury convicted Smith on eight counts of the indictment. He was sentenced to 292 months for the conspiracy charge, with concurrent sentences of 120 months for money laundering, 60 months as to each of three tax evasion charges, and 36 months as to each of three charges of filing false tax returns. Smith filed a notice of appeal, but voluntarily dismissed the appeal without briefing. Smith's § 2255 motion followed. The sole ground Smith raises in his motion is that his trial counsel was ineffective in a variety of ways.

## II.

Ineffective assistance of trial counsel may be raised in a § 2255 motion regardless of whether the defendant raised the issue on direct appeal, as long as extrinsic evidence is presented to support the motion. *McCleese v. United States*, 75 F.3d 1174, 1178 (7th Cir. 1996). In order for the motion to prevail, Smith must satisfy a two-part inquiry. He must show that counsel's performance fell below an objective standard of reasonableness (the performance prong) and that there is a reasonable probability that but for these errors the outcome of the proceedings would have differed (the prejudice prong). *Strickland v. Washington*, 466 U.S. 668, 688-92 (1984). To satisfy the performance prong, Smith must

identify the specific acts or omissions of counsel that formed the basis for his claim of ineffective assistance. *Id*. at 690. The court "must then determine whether, in light of all the circumstances, the identified acts were outside the wide range of professionally competent assistance." *Id*. A reasonable probability of a different result to satisfy the prejudice prong means a "probability sufficient to undermine confidence in the outcome [of the trial]." *Id*. at 694.

III.

Smith first argues that his trial counsel was ineffective for failing to object at all to the government's case. Smith argues that his trial counsel was ineffective for failing to object to the government's leading questions, failing to challenge the foundation of witness' purported knowledge, failing to object to an improper disclosure that an investigator asked Smith to take a polygraph test, and failing to cross-examine government witnesses. Smith has not shown that any of these failures constituted ineffective assistance.

First, Smith argues that his counsel was ineffective by failing to object at all to the government's leading questions or to the lack of foundation to questions asked of witnesses, particularly witnesses testifying about Smith's involvement in James's drug operations. Smith's counsel made only one objection

during the trial, and that objection was on a minor issue.[3]  It is true, as Smith contends, that the government asked numerous leading questions, so many that the court made mention of it.  However, with one exception addressed below, Smith has not identified how any testimony to which his counsel did not object prejudiced him. The Seventh Circuit has previously explained that the failure to object to leading questions may be a proper trial strategy, since it is possible for objections to irritate the jury.  *United States v. Pedigo*, 12 F.3d 618, 623 (7th Cir. 1993).  Absent specific argument about specific errors and how those errors prejudiced his defense, Smith has not established his claim.  *United States v. Cronic*, 466 U.S. 648, 659 n.26 (1984) (citations omitted).  Smith may not merely cite to the general principle that defendant's counsel must maintain the adversarial balance between the parties. *See, e.g.*, *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993) (citations omitted).  I also agree with the government that Smith has not suggested that the government's use of leading questions allowed it to present testimony that it would not have been able to introduce using direct questions.  Furthermore, Smith has not presented any examples of a challenge his trial counsel could have

---

[3]Smith's counsel objected to a fairly innocuous question directed to Carl Pate ("Pate"), who testified that he cooked cocaine for James and provided some security.  The government asked Pate whether there were times "where it was hard for anybody to find cocaine."  (*United States v. Smith*, No. 03 CR 133, Transcript of Proceedings at 724 (N.D. Ill Nov. 4, 2004).)  Foley objected to the term "anybody."  (*Id.*)

made on lack of foundation grounds that would have resulted in the exclusion of the testimony. Smith has not pointed to what prejudice his defense suffered and therefore fails to meet the prejudice prong under *Strickland*, 466 U.S. at 690.

Second, Smith argues that his trial counsel erred when she did not object and ask the court to instruct the jury to disregard testimony by an FBI agent who referred to Smith being asked to take a polygraph test.[4] Smith contends that a motion for a mistrial would have been appropriate. While his counsel could have made

---

[4]The government presented testimony from an FBI agent who had interviewed Smith about his tax returns and gambling income. The agent testified that he had a later meeting with Smith to return some of the documents taken from Smith during the first meeting. (*Smith*, Tr. of Proceedings at 577 (Nov. 3, 2004).) At that meeting, he testified that he handed back the documents to Smith, and that Smith was angry about the attention and asked the FBI agents why they would think he would know someone who could sell narcotics on his behalf. (*Id.* at 578.) The witness and the government then had the following exchange:

Q:  After you had that discussion, what did you do?
A:  We asked him if he was willing to submit to a polygraph examination.
Q:  Did you leave shortly after that?
A:  Yes, yes.
Q   No more questions, Your Honor.

(*Id.*) Smith's counsel then asked for a sidebar, and stated that she believed the government had instructed the witness not to discuss the polygraph. The government apologized and stated that he would not elicit anything further about the polygraph. The court asked Smith's counsel if she wanted an instruction to the jury to disregard the testimony. Smith's counsel wavered, and the court noted that it did not know "whether it's worse to refer to it or not." Smith's counsel concluded that as long as she had an assurance from the prosecutors that it would not be referenced again she would let it go. (*Id.* at 579-80.)

12

such a motion, the mention of the request for a polygraph examination would not have resulted in a mistrial. In the Seventh Circuit, the admissibility of polygraph evidence is left to the discretion of the district court. *United States v. Dietrich*, 854 F.2d 1056, 1060 (7th Cir. 1988) (citation omitted). In *Dietrich*, a government witness was asked if a prior statement he gave was the truth. *Id.* at 1058-59. He responded that it was and added, unprompted, that he had taken a polygraph test. *Id.* at 1059. The judge instructed the jury to disregard that comment. *Id.* On appeal, the defendant argued that the testimony about the polygraph was reversible error, as was the judge's failure to give a cautionary instruction at the conclusion of the trial. *Id.* The Seventh Circuit concluded that neither was reversible error, since the immediate limiting instruction cured any error. *Id.* (citing *Opper v. United States*, 348 U.S. 84, 95 (1954)).

Here, the effect of the comment concerning a polygraph was arguably greater than in *Dietrich* since a law enforcement witness stated, despite a prior ruling from the court that polygraph evidence would not be admitted, that he had asked the defendant if he was willing to take a polygraph exam. However, any harm in this question could have been resolved by a limiting instruction; a motion for a mistrial would not have been granted. And, counsel's strategic decision not to have the judge give a limiting instruction was defensible strategy, since a limiting instruction

might have called the jury's attention to the mention of the polygraph more than simply ignoring it did. *United States v. Allen*, 390 F.3d 944, 951 (7th Cir. 2004) (citing *United States v. Payne*, 741 F.2d 887, 891 (7th Cir. 1984) ("A competent trial attorney might well eschew objecting . . . in order to minimize jury attention to the damaging material.")). Smith cannot show that this decision by his counsel was not a defensible strategic decision.

Smith also contends that his trial counsel did not conduct "meaningful cross-examination" of government witnesses who had been using narcotics during the time period in which they were asked to recollect events. However, a review of the record shows that Smith's counsel did ask questions to highlight drug use as well as other questions about their prior convictions, motives for testifying, and involvement in illegal activities that she hoped would challenge their credibility. She also argued during closing argument that these witnesses were inherently untrustworthy, and that they were testifying about events that could not possibly have occurred. Smith has not shown that her performance fell outside of the wide range of professionally competent assistance. *Strickland*, 466 U.S. at 690.

IV.

Smith next contends that his trial counsel was ineffective because she improperly advised him not to testify on his own behalf. Smith avers:

> I wanted to testify on my own behalf. I was the only person who could explain how I won substantial amounts of money by playing slot machines. She insisted I not testify. She told me I could be charged with perjury even though I would be telling the truth.

(Smith Memo. Ex. 3, Smith Aff. ¶ 3(D).) Smith's trial counsel presents her own affidavit in which she disputes this, stating that she explained to Smith that he had a right to testify but that he "consistently indicated that he did not want to testify." (Gov. Resp. Ex. A, Foley Aff. ¶ 4.) She also avers that she does not remember telling Smith he might be charged with perjury, but she did discuss with him that if he testified and was convicted he could receive an obstruction of justice sentencing enhancement. (*Id.*)

As part of his right to defend himself, a defendant has a constitutional right to testify on his own behalf. *Underwood v. Clark*, 939 F.2d 473, 475 (7th Cir. 1991) (citing *Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987)). Any waiver of this right must be knowing and voluntary. *Ward v. Sternes*, 334 F.3d 696, 705 (7th Cir. 2003) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 241 (1973)). Counsel may not waive this right on her client's behalf. *Id.* (citing *Jones v. Barnes*, 463 U.S. 745, 751 (1983)). However,

it is not an unequivocal right, and is still subject to the harmless error standard. *Id.* at 708 (citing *Ortega v. O'Leary*, 843 F.2d 258, 262 (7th Cir. 1988)); *but see Underwood*, 939 F.2d at 475 (noting some uncertainty about whether the right is subject to harmless error, comparing the holding in *Ortega* with the holding in *United States v. Curtis*, 742 F.2d 1070, 1076 (7th Cir. 1984) (per curiam)). The Seventh Circuit concluded in *Underwood* that for a defendant to successfully establish a violation of this right during a collateral proceeding the defendant must do more than make a "barebones assertion" that his lawyer would not allow him to testify. 939 F.2d at 475-76 ("[I]n a subsequent collateral attack on the conviction the defendant must produce something more than a bare, unsubstantiated, thoroughly self-serving, and none too plausible statement that his lawyer (in violation of professional standards) forbade him to take the stand.").

As recognized in *Taylor v. United States*, 287 F.3d 658 (7th Cir. 2002), there are two potential arguments that a defendant can make about his right to testify: that he was unconstitutionally denied that right, and that his counsel was ineffective for failing to give him good advice about whether to exercise that right. *Id.* at 662-63. Here, it is unclear which argument Smith is making. Smith never contends that he did not understand that he had a right to testify. His affidavit does not directly state that his counsel refused to allow him to exercise that right; it states that his

counsel "insisted" that he not testify.  This appears to be advice rather than refusal to allow him to take the stand, as the Seventh Circuit has recognized would be a denial of his right to testify. *Id.* at 661.  Second, Smith's affidavit does not support a conclusion that his counsel was ineffective for advising him not to testify.  It is true that Smith could have been charged with perjury had he testified.  Further, Smith's affidavit contends that he wanted to testify so he could explain to the jury how he won substantial amounts of money playing the slot machine.  Given the expert testimony that the government put forward that eviscerated any credible contention that Smith won vast amounts of money playing slot machines, counsel probably gave Smith good advice not to take the stand and face cross-examination on incredible testimony.  Perjury, or obstruction of justice, were legitimate concerns.  Smith's affidavit presents no evidence from which I could conclude that his testimony would have been useful.

For similar reasons, I find that even if Smith was denied his right to testify or received ineffective assistance about this decision, any error was harmless, and he has not presented sufficient evidence to meet the prejudice prong of the *Strickland* test.  There was substantial evidence that Smith could not have won significant amounts of money gambling; the overwhelming evidence was that he lost significant amounts of money this way.  Smith has not indicated what his exact testimony would have been and how it

would have changed the outcome of the trial.  His improbable story would have been weighed against the government's expert witnesses, and would not have changed the outcome of the trial.

V.

Smith also argues that his trial counsel was ineffective by failing to investigate and elicit testimony from four witnesses: Terry Smith,[5] Smith's nephew; Vince Smith ("Vince"),[6] Smith's son; Richard Peck, Jr. ("Peck"), and Terry O'Banner ("O'Banner"). Smith states in his affidavit that his trial counsel failed to "interview and call witnesses on my behalf who would have presented favorable testimony." (Smith Memo. Ex. 3, Smith Aff. at ¶¶ 3(A), (B).)  He argues that Terry and Vince would have contradicted testimony from Rauner that Rauner was distributing cocaine from Smith. (*Id.* at ¶ 3(A).)  He also argues that Peck and O'Banner would have testified that he provided them with information that led to raids on James's apartment, and that this evidence would have established a motive

---

[5]The government refers to Smith's nephew as Terrence while Smith's memorandum refers to him as "Terry."  For consistency he will be referred to as "Terry" as that is how he signed his name in an attached affidavit.

[6]The government's brief refers to Smith's son as "Vincent." However, in an attached affidavit, he states that his first name is Vince, not Vincent, and "no one calls [him] Vincent."

for the co-conspirator witnesses to have lied at trial.[7] (*Id.* at ¶ 3(B).)

"Usually, counsel's decision not to call a witness is a tactical choice not subject to review." *Barnhill v. Flannigan*, 42 F.3d 1074, 1078 (7th Cir. 1994) (citing *Cartee v. Nix*, 803 F.2d 296, 303 (7th Cir. 1986)). Smith bears the burden of rebutting the presumption that his trial counsel made reasonable strategic choices in not calling certain witnesses. *Strickland*, 466 U.S. at 689-90. Counsel has a duty to her client to make a reasonable investigation of witnesses or to "make a reasonable decision that makes particular investigations unnecessary," and failure to fulfill this duty can be ineffective assistance. *Adams v. Bertrand*, 453 F.3d 428, 436 (7th Cir. 2006) (citations omitted). The "failure to investigate a particular lead may be excused if a lawyer has made a 'reasonable decision that makes particular investigations unnecessary.'" *Washington v. Smith*, 219 F.3d 620,

_____

[7]In her affidavit, Smith's counsel avers that she and Smith discussed whether Terry Smith should testify, and that she did not want to call Terry because she believed his extensive criminal record would hurt Smith. (Gov. Resp. Ex. A, Foley Aff. at ¶ 5.) She also states that she and Smith discussed the possibility of calling Vince, but that neither Smith nor Vince wanted Vince to testify because they were concerned about Vince's possible criminal exposure. (*Id.* at ¶ 6.) Finally, she avers that she asked her investigator to find and interview Peck, and that although she does not now remember what her investigator told her about Peck, "I do recall that as a result of that investigation, I concluded that there was no chance that Peck would be a helpful witness." (*Id.* at ¶ 7.) She avers that she and Smith agreed that Smith would not use Terry, Vince or Peck as witnesses. (*Id.* at ¶¶ 5, 6 & 7.)

631 (7th Cir. 2000) (quoting *Strickland*, 466 U.S. at 691)); *see also Williams v. Washington*, 59 F.3d 673, 680-81 (7th Cir. 1995) ("Ineffective assistance doctrine teaches that 'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'") (quoting *Strickland*, 466 U.S. at 690-91).

## A.  Terry Smith

Smith claims that Terry's testimony would have contradicted the testimony from Jason Rauner that he distributed cocaine obtained from Smith.  Smith presents an affidavit from Terry averring that had he been called as a witness, he would have testified he never sold or delivered cocaine to Rauner, he never told Rauner that Smith gave him cocaine from the evidence room, he never introduced Smith to Rauner, he never told Rauner that Smith would call him to collect money Rauner owed Smith, and that he gave Smith a check for $87,000  which was proceeds from his mother's life insurance policy for Smith to distribute to Terry for living expenses.  (Smith Memo. Ex. 4, Terry Smith Aff. ¶ 4.)  There is an implied evidentiary dispute between Smith's and his counsel's affidavits; Smith avers that his counsel "refused" to investigate and call Terry as a witness, while his counsel claims that she and Smith agreed that Terry would not testify.  However, Smith does not dispute his counsel's contention that Terry Smith had a lengthy

criminal record.  Smith has not presented any evidence that Terry's testimony would have provided anything other than a blanket denial that Rauner was telling the truth.  In view of his criminal history, this testimony may or may not have been deemed credible. Smith's counsel made a reasonable decision not to further investigate or call Terry to testify.

### B.  Vince Smith

Smith also contends that testimony from his son Vince would have contradicted Rauner.  When asked if he had met other members of Smith's family besides Terry, Rauner testified that he met Smith's sons "Mark and Vincent" because "they came by Terry's house, and we played, you know, we'd go to the basketball courts, play ball, or we'd sit around Terry's house, smoke weed, you know, just hanging out."  (*Smith*, Tr. of Proceedings at 524 (Nov. 3, 2004).)  Vince averred that he told Smith's counsel that his name was Vince, not Vincent, that no one calls him Vincent, and that he told her he wanted to testify because Rauner was lying about meeting him and about playing basketball with him and his brother. (Smith Memo. Ex. 5, Vince Smith Aff. ¶ 6.)  According to Vince, he never saw Rauner before Rauner testified in court.  (*Id.*)  Vince avers that Smith refused to call him as a witness and gave him no explanation.  (*Id.*)

Even assuming that Smith's counsel did not make a reasonable decision in not calling Vince, since there is no affirmative

evidence that calling Vince would have been helpful to Smith's case, there is no basis to believe that not calling Vince prejudiced Smith's defense. *Strickland*, 466 U.S. at 690. Assuming that Vince had testified and been deemed credible, his testimony would only have undermined a small portion of Rauner's testimony, that he met Vince. Vince's affidavit does not support that he could have refuted any aspect of Rauner's testimony about his involvement in purchasing drugs from Terry and Smith's involvement as a supplier in those transactions. Further, Rauner's testimony was collateral to the main issues at the trial, whether Smith had conspired with James and others to possess and distribute cocaine. There was overwhelming evidence that Smith was involved in that conspiracy, so while Rauner's testimony might have provided further evidence of Smith's familiarity with and involvement in drug sales, it was not necessary to establish the key issues in the case.

C. Richard Peck, Sr. and Terry O'Banner

Peck and O'Banner were police officers that Smith contends should have testified on his behalf. Smith states that he gave the officers information which led to raids on James's home and led to the arrests of two individuals in James's drug operation, Lola James and Claudette James, which would have shown motive for James's co-conspirators to testify against him. Lola James testified against Smith at his trial, but Claudette James did not. Smith does not provide any affidavits from either Peck or O'Banner

about what they would have said if called to testify. Smith's affidavit does not provide enough details for me to hold an evidentiary hearing to further explore these issues. Smith's affidavit provides no basis for me to believe that any other co-conspirators besides Lola James had any reason to believe that Smith was responsible for those raids, such that they would have had a motive to provide false testimony against Smith. Further, although his affidavit states that after her arrest Lola James "accused [him] of being responsible for those raids" he never explains how he knew that she accused him and what form this accusation took. He has presented no evidence from the officers themselves about what their testimony would have been. His affidavit is devoid of the kind of detail necessary to require an evidentiary hearing. *Galbraith v. United States*, 313 F.3d 1001, 1009-10 (7th Cir. 2002) (holding that a petitioner must submit a sworn affidavit showing what specific facts support the petitioner's assertions in order to receive an evidentiary hearing). Further, numerous individuals testified about Smith's involvement with James, so even if Smith could show that two co-conspirators had some animus against him, this would have been overshadowed by the many other individuals who testified against him.

Smith further alleges that his trial counsel was ineffective because she failed to object to the government's *Santiago* proffer concerning the admissibility of the co-conspirators' testimony. He contends that she should have argued that their testimony was too unreliable to be admissible since many admitted to heavy drug use during the time period about which they were to testify.[8] Smith has not demonstrated that this evidence was improperly admitted. I agree that the government's *Santiago* proffer properly established by a preponderance of the evidence that (1) a conspiracy existed; (2) Smith and the declarants were involved in the conspiracy; and (3) the statements were made during and in furtherance of the conspiracy. *United States v. Haynie*, 179 F.3d 1048, 1050 (7th Cir. 1999) (citing *United States v. Godinez*, 110 F.3d 448, 454 (7th Cir. 1997)). Further, as discussed *supra*, Smith's counsel did cross-examine many of the co-conspirators about their drug use and asked other questions to elicit evidence suggesting their testimony was unreliable.

VII.

Finally, Smith contends that his counsel was ineffective for failing to object to certain evidence introduced under Federal Rule

---

[8]His trial counsel avers that she did not object to the proffer because she believed the government had a sufficient basis, and she planned to attack the witnesses's credibility during their testimony.

of Evidence 404(b). He argues that his counsel should have objected to the testimony of Rauner, Claudia Lemon ("Lemon"), Pamela Brown ("Brown"), and Rauner because under Federal Rule of Evidence 403 the probative value of their testimony was far outweighed by the danger that this evidence created unfair prejudice, confusion of the issues, or was misleading to the jury. *United States v. Thomas*, 321 F.3d 627, 630 (7th Cir. 2003).

A. Jason Rauner

As discussed above, Rauner testified that he purchased cocaine from Terry on a regular basis, and that he learned from Terry that Smith supplied Terry with cocaine stolen from the evidence room. Rauner also testified Smith contacted him to obtain payment from Rauner for drug debts Rauner owed Terry. Smith contends that this testimony was too damaging and prejudicial, especially because of the risk the jury would use this testimony as evidence that Smith had a propensity to be involved in drug activity. In her affidavit, Smith's counsel stated that she chose not to object to Rauner's testimony as 404(b) evidence because she did not believe that she would win this argument and she wanted to focus her objections on the other 404(b) testimony that she felt was more damaging. First, there is no reason to believe that Smith's counsel could have successfully excluded Rauner's testimony; it was proper 404(b) evidence. In addition, the court did instruct the jury that evidence the jury heard "of acts of the defendant other

than those charged in the indictment" should be considered "only on the question of opportunity, intent, plan and knowledge." (*Smith*, Tr. of Proceedings at 1396 (Nov. 10, 2004).) The jury was properly instructed about the limited purpose of this evidence.

### B. Claudia Lemon and Pamela Brown

Smith also argues that his counsel should have objected to the testimony of Lemon and Brown. Lemon and Brown both testified about extramarital affairs they had with Smith in 1999. They testified that they went on gambling trips to Las Vegas with Smith, and that he gave them large amounts of cash while on those trips. Brown also testified that on one occasion Smith showed her a ball of cocaine kept in his home, and that they used the cocaine together. But the government correctly points out that Smith's counsel objected to the admissibility of this evidence during the pre-trial conference, contending that evidence of extramarital relationships was overly prejudicial and that the evidence of Smith possessing cocaine was inflammatory. The court admitted this evidence over her objection, so the use of this testimony at trial can hardly be imputed to Smith's counsel's ineffective assistance.

### VIII.

Since I find from the pleadings, files and records of this case that Smith is not entitled to any relief, I need not hold an

evidentiary hearing on Smith's motion.  *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007).  Accordingly, Smith's § 2255 motion is denied.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge


Dated: December 4, 2007